18840

The STATE, Respondent, v. Brian D. RIDGELY, Appellant
(164 S. E. (2d) 439)

*Messrs. Wm. K. Charles, Jr.,* and *Ted Wyndham,* of Greenwood, *for Appellant,*

*William T. Jones, Esq., Solicitor,* of Greenwood, *for Respondent,*

November 18, 1968.

LITTLEJOHN, Justice.

The appellant-defendant, Brian D. Ridgely, was found guilty (with recommendation to mercy) of the murder with a blunt instrument of his eighteen-month old step-daughter, Lindy Ann Morris.

At the conclusion of the evidence offered by the State the defendant moved for a directed verdict. The motion was denied and the defendant offered no evidence. After the jury found a guilty verdict, his counsel moved for judgement non obstante veredicto, and in the alternative, for a new trial. Both motions were refused. He was then sentenced by the trial judge to life imprisonment as required by the applicable statute.

This appeal charges error on the part of the trial judge in refusing the defendant's motions for a directed verdict, for judgement *non obstante veredicto,* and for a new trial. It further alleges error in admitting certain testimony hereinafter discussed.

Because much of the evidence relied upon by the state to prove the guilt of the defendant is circumstantial, and be-

cause the defendant challenges. both the sufficiency of the total evidence and the competency of portions thereof, it is necessary to review the evidence in some detail.

The nineteen-year old defendant, while in military service and stationed at Ft. Gordon, Georgia, married Mrs. Brenda Joyce Morris on January 6, 1966. In April, 1966, the defendant was discharged from the army, and he, with his wife and two step-children, moved to Abbeville, South Carolina, where he was employed by Hale Manufacturing Company. About June 1, 1966, they moved to Greenwood and Mrs. Ridgely continued her employment with Hale in Abbeville, but the defendant at the time of the offense charged was unemployed.

Mrs. Ridgely was granted custody of her two children in Aiken after a court contest with their father, Mr. Morris. Morris had entered into a marriage ceremony with the mother of the two children prior to their birth, but it developed that Morris was never divorced from a previous marriage and accordingly the Morris marriage was void and her marriage to Ridgely was apparently valid.

Commencing about June first Mr. and Mrs. Ridgely lived in an apartment house in Greenwood. She continued to work in Abbeville, several miles away, and used the family car to commute to her job. After the same became disabled she left the two children with a Miss Evans who kept them as needed when Mrs. Ridgely stayed nights in Abbeville. They were left with Miss Evans on Monday prior to the death of the child on Wednesday while Mrs. Ridgely was away in Abbeville working. She returned on Tuesday long enough to visit with the children and told Miss Evans that she wanted to leave them there until Thursday, which would be June 30.

On Wednesday, June 29, the defendant went to the home of Miss Evans and got the two children, Brenda, age three, and Lindy, age eighteen months, stating that he would keep them until about 5 o'clock of that day.

At approximately 3 o'clock the same afternoon the defendant phoned the police department of the City of Greenwood and stated that he had gone up the street from the apartment to a store, leaving the two small children alone, and that when he returned the smaller child was missing. He also said that he had found a note which read in part: "I had to have some money."

When the investigating officers arrived at the defendent's apartment Ridgely confirmed the telephone report and delivered to the officers a purported kidnap-ransom note which read as follows: "If you want your baby back you will have $500 within the next 72 hours. Will be in touch."

The officers, along with Ridgely, searched the house and surrounding area but failed to find Lindy, his eighteen-month old step-daughter.

After the defendant sent for the investigating officers he called his wife, who was at work in Abbeville, and proceeded to go for her and returned her to Greenwood, returning to the apartment with his wife about 5 o'clock in the afternoon.

The next contact with the police came around 7:30 or 8 o'clock when the defendant and his wife returned to their apartment after going out to eat. Two officers were further checking the area around the apartment, and these officers, in response to a telephone call from the police department, asked the defendant and his wife if they would ride down to the police station with the officers. Mr. and Mrs. Ridgely agreed to accompany the officers and they left for the police station around 9 o'clock p.m. Mr. Morris had driven up from Aiken and was also there.

Discussions with defendant and his wife at the station produced no additional information and Mrs. Ridgely asked the officers to take her back to the apartment to check over some papers concerning the custody proceedings in court involving her children. It is the testimony of the officer who took her back to the apartment that Mrs. Ridgely at

the time continued to believe the children's natural father (Mr. Morris) had had something to do with Lindy's disappearance, and that no one yet had any idea that the child was dead or that Ridgely had had anything to do with her disappearance.

After his wife returned to the police station, the officers continued to talk to Ridgely. They informed him that they had tried to check everything but had failed to find any evidence of the child's whereabouts and that although the police were not accusing anyone, since he was the last person seen with the missing child the police would like to talk with him further. He was informed of his constitutional rights in a manner hereinafter described, but Lt. Fortson of the South Carolina Law Enforcement Division, in charge of the endeavors to locate the missing child, testified that Ridgely was not under arrest and that he was free to leave at any time. Lt. Fortson asked Ridgely if he would go to Columbia to take a lie detector test and explained to him "that it would be free and voluntary on his part, that he did not have to go. I explained the purpose that we were going for. * * * I told him it would be free and voluntary, that nobody would attempt to force him to take the lie detector.". Ridgely is quoted as saying, "I'll take the test and be glad to answer any questions."

Lt. Fortson, City Police Officer George Edward Young, and Ridgely left Greenwood around 10 o'clock and arrived at the South Carolina Law Enforcement Division Headquarters between 11:30 and midnight. Lt. Fortson testified that Ridgely was not questioned at all en route to Columbia. They had a flat tire on the automobile and all joined in to help put the spare on the wheel.

Upon reaching headquarters Ridgely went with Lt. Wyndham into the room containing the polygraph equipment, and Lt. Wyndham apprised him of his rights as is shown by the following testimony:

"Q. Would you enumerate those rights about which you apprised him?

"A. I advised him that he had a right that he didn't have. to say anything unless he chose to do so; anything that he said would be used against him in Court; that he had a right to obtain an attorney; if he didn't have the means to obtain an attorney, that the Court would appoint him an attorney before any questions. I asked him if he wanted an attorney and he said no. And I asked him was he willing to talk about his step-daughter.

"Q. Did he answer that?

"A. He said yes."

Lt. Wyndham testified that after he had been with the defendant for about thirty minutes, Ridgely revealed that the child was dead and that he knew where the body was because he had taken it out of the house in a suitcase and had disposed of it in some weeds behind his apartment. He said that he was left-handed, and he had printed the ransom note himself with his right hand.

Thereafter Lt. Wyndham left the defendant in the room by himself and returned shortly with Lt. Fortson and Officer Young.

Lt. Fortson testified that at this point he again asked if the defendant would like a lawyer, and the defendant replied in the negative.

Lt. Fortson testified that the defendant then continued to talk:

"He said that no one loved him. Said it was a accident, he didn't mean to do it. Said that while he had the children there at the apartment he took a bath and after he finished the bath he dressed. and went to the store to get the cigarettes and milk, but forget to let the water out of the bathtub; and when he returned to the house that Lindy Ann was in the bathtub scalded to death. He told us that he put her in a suitcase and took her out in the woods behind the apartment, and that he would take us to the body."

About 1 o'clock a.m. Lt. Fortson, Mr. Young and Ridgely left Columbia to return to Greenwood and went to an area back of the apartment building pointed out by Ridgely and found the unclothed dead body of Lindy Morris at about 2:30 a.m. The coroner was called, and Ridgely was carried to the Greenwood county jail.

A pathologist performed an autopsy later that morning and testified at the trial that in his opinion the child's death "resulted from a severe fracture of the left side of the skull, with associated hemorrhage into the brain cavity." Although the pathologist testified that "the skin of the feet, legs, buttocks, abdomen, hands and forearms showed first and second degree burns, with fairly uniform diffuse intense redness," and that "there were additional burns about the face and the anterior chest wall," it was his opinion that "the burns did not cause the death." The pathologist also noted that the distal portion of the right humerus had been fractured and displaced laterally, that the middle right of the right radius was fractured, and that the anterior chest wall and abdomen were marred by multiple blue discolorations.

The contention of Ridgely on trial, and now, is that the full summary of the testiony submitted by the state is not sufficient to create a reasonable inference that he committed the crime charged. The fact of death is beyond question. The cause of death cannot be said to be in contest, but it is argued that there was no evidence going to show that Ridgely committed the crime charged. It cannot be doubted that unless the state produced some competent evidence, direct or circumstantial, tending to show that the appellant wilfully and feloniously brought about the death of the child the jury should have been directed to find him not guilty.

> The issue raised by the question concerning the denial of the defendants motions for a directed verdict and a new trial is whether the guilt of the de-

fendant might have been fairly and logically deduced, not merely suspected, from the evidence adduced at the trial. On motion the trial judge is concerned with the existence of evidence, not with its weight; and "although he should not refuse to grant the motion where the evidence merely raises a suspicion that the accused is guilty, it is his duty to submit the case to the jury if there be any substantial evidence which reasonably tends to prove the guilt of the accused, or from which his guilt may be fairly and logically deduced." *State v. Littlejohn;* 228 S. C. 324, 89 S. E. (2d) 924 (1955).

The testimony reveals that Lindy Ann Morris was last seen alive in the care and custody of the defendant; that her body was found some fourteen or fifteen hours thereafter in a patch of weeds approximately 600 from the defendant's apartment; that it had obviously been placed there within three hours after Ridgely got the child from the Evans house; that the defendant told law enforcement officers where the body could be found and directed them to it; that the defendant first called police headquarters in Greenwood and reported that the child had disappeared and that a ransom-kidnap note had been left behind; that the defendant later told the police that he had printed the note; that the defendant said it was an accident and he did not mean to do it; that the pathologist who performed the autopsy noted the presence of bruises, two fractures of the arm, and a fracture of the skull and that he stated that in his expert opinion the child's death "resulted from a severe fracture of the left side of the skull with associated hemorrhage into the brain cavity."

Circumstantial evidence sufficient to amount to proof of guilt can never be defined precisely or exclusively. When all of the above enumerated facts and circumstances are considered together, however, the trial judge, in our opinion, committed no error of law in finding that the jury could logically and fairly infer the defendant's guilt therefrom, and in submitting the case to the jury.

Although the facts and circumstances in a case in which the State relies solely on circumstantial evidence must be consistent with the guilt of the accused and inconsistent with his innocence, this question goes to the weight of the evidence and is thus clearly for the jury. *State v. Roddy,* 126 S. C. 499, 120 S. E. 359 (1923).

The facts in this case are similar in many respects to the facts in the case of *State v. Epes,* 209 S. C. 246, 39 S. E. (2d) 769 (1946). In that case the accused reported to the police the disappearance of his wife and pretended to aid in search of her. Later he admitted that he had concealed her body and led the police to an improvised grave. It was his contention that his wife took an overdose of medicine and died as a result of it. In that case, as here, the law of circumstantial evidence was largely relied upon by the State. Referring to concealment of the body of a murdered person, this court said:

"The general rule is that the concealment or the attempted destruction of a body of a person murdered is regarded as an incriminating circumstance and will be given probative force in connection with other facts. See Annotation 2 A.L.R. 1227, and the numerous cases there cited to sustain this proposition; and also, Wigmore on Evidence, (2d) Ed., Secs. 32, 172, 267, 272 and 276.

"The action of the appellant in concealing the body of his wife so as to divert suspicion from himself was a relevant circumstance tending to show guilt, and it was for the jury to estimate its weight, and it was for the jury to determine whether his explanation and the motive he assigned were truthful or otherwise." 39 S. E. (2d) at 777.

In our opinion the lower court correctly submitted the issues to the jury and we find no error.

In determining that a jury issue was involved we have set forth all of the evidence which we think properly admissible, including that objected to at the trial and made a ground of appeal. We now proceed to consider the other

questions raised on this appeal, to wit: (1) did the lower court err in finding that the state had met its burden of showing that certain ' alleged statements of the defendant were freely and voluntarily given, that the defendant's consitutional rights were protected and that therefore the statements were admissible; and (2) was the admission of testimony relative to the taking of a lie detector test prejudicial error.

Ridgely contends the state failed to use adequate procedural safeguards to secure his privilege against self-incrimination. In substance his claim is that the warnings as to his constitutional rights which were given in Greenwood before his trip to Columbia were not clear and did not indicate that he was entitled to a lawyer immediately.

The United States Supreme Court in *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. (2d) 6494. (1966), held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * * Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444, 86 S. Ct. at 1612.

The testimony of Lt. Fortson is that the defendant was told in Greenwood before he was asked about the lie detector test that "should he be charged with anything" the court would appoint him a lawyer. The defendant's admission that he hid the body of his step-daughter occurred in Columbia, however, and the testimony concerning the warning given

to defendant by Lt. Wyndham in Columbia is clearly that he could have an attorney *before any questions were asked.* The defendant argues that the State has failed to carry the burden of proof that the defendant was properly warned because the warning in Greenwood may have left the defendant without knowledge of his right to an attorney at that time.

While it does seem that the warning that he may have an attorney *should he be charged* with anything does not comply with the requirements of the *Miranda* decision, the uncontroverted testimony in this case is that such admissions as were made occurred after the obviously adequate warning by Lt. Wyndham in Columbia and that the only testimony as to the defendant's statements between the inadequate warning in Greenwood and the adequate warning in Columbia was to the effect that he would go to Columbia to take a lie detector test and that he did not care to have a lawyer.

The procedural safeguards set out by the United States Supreme Court in *Miranda* are designed to insure voluntariness in the interrogation of persons in custody. In this case it was the defendant who initiated the police investigation by asking for help in finding his step-daughter.

The lower court properly found that the state met its burden of showing adequate safeguards for the protection of the defendant's constitutional rights and therefore correctly admitted testimony concerning statements made by the defendant.

The final question on this appeal relates to the admission of testimony of the police officers concerning the lie detector test. The officer who took the defendant to Columbia, Lt. Forston, testified that he explained to the defendant in Greenwood that the purpose of a trip to Columbia would be to take a lie detector test. Later in the trial Lt. Wyndham, the officer who gives lie detector tests, testified that he was with the defendant for a period of about

thirty minutes in the polygraph room but that the defendant was not under constant questioning during that time and that "there were other things that I was doing." The defendant says that the only inference which can be drawn from this testimony is that Lt. Wyndham had given the defendant a lie detector test and was testifying to the results thereof. The defendant relies on the case of *State v. Britt*, 235 S. C. 395, 111 S. E. 2d 669 (1959) for the proposition that lie-detector-test results are not admissible and that the mention of such results could well have affected the verdict. The *Britt* case, however, dealt with the mention of refusal to take a lie detector test.

Although the evidence is perhaps susceptible of the inference that a lie detector test was given or at least begun there is nothing in the testimony from which the jury could reasonably infer that Lt. Wyndham was testifying as to the results of such a test. The probative effect of his testimony was rather that the defendant had changed his story and was now admitting some connection with the disappearance of his stepdaughter.

The exceptions are overruled and the judgment of the circuit court is accordingly,

Affirmed.

Moss, C. J., Lewis and Bussey, JJ., and Clarence E. Singletary, Acting Associate Justice, concur.