### 23957

The STATE, Appellant v. Glenn V. THRIFT, Gary V. Thrift, John David Gilreath, Sr., Joel Lewis Wilson, and Rogers Dennis Carroll, Respondents. The STATE, Appellant v. Thomas E. THRIFT, Respondent. The STATE, Appellant v. Samuel F. THRIFT, Respondent. The STATE, Appellant v. Norman Franklin REEVES, Respondent.

(440 S.E. (2d) 341)

Supreme Court

*T. Travis Medlock*, Atty. Gen., *Cameron M. Currie*, Chief Deputy Atty. Gen., and *Charles W. Gambrell, Jr.*, Deputy Atty. Gen., Columbia, *for appellant.*

*O. William Bannister* and *D. Garrison Hill*, Greenville, *for respondent Glenn V. Thrift.*

*Andrew J. Savage, III*, Charleston and *Charles H. Williams*, Orangeburg, *for respondent Gary B. Thrift.*

*Terrell L. Glenn, Peter L. Murphy, Elizabeth V. Gray* and *Elizabeth Howard Simmons*, Columbia, *for respondent John David Gilreath, Jr.*

*Richard W. Vieth*, Spartanburg, *for respondent Joel Lewis Wilson.*

*Albert Q. Taylor, Jr.*, Greenville, *for respondent Rogers Dennis Carroll.*

*Bobby Lee Cook*, Summerville, GA, and *Gedney M. Howe*, Charleston, *for respondents Samuel F. Thrift* and *Thomas E. Thrift.*

*William A. Coates*, Greenville, *for respondent Norman Franklin Reeves.*

## ORDER

The petition for rehearing is granted. We dispense with further briefing and withdraw the opinion in *The State v. Glenn V. Thrift, et al.*, Op. No. 23957 (S.C. Sup. Ct. filed December 6, 1993) (Davis Adv. Sh. No. 29 at 5). The opinion which follows this order is hereby substituted. The following changes have been made in the original opinion: [*Editors Note:* Changes incorporated into the published opinion.]

It is so ordered.

Heard May 3, 1993.

Refiled Jan. 17, 1994.

TOAL, Justice:

The State appeals from the pretrial order of the trial judge dismissing the indictments against multiple defendants charged in this complex public corruption case. We affirm in part and reverse in part.

## FACTS

Thrift Brothers, Inc. is a family-owned road paving business based in upstate South Carolina. The principals are three brothers, Respondents Sam, Tom, and Glenn Thrift, and a son, Gary Thrift. For many years, the Thrift Brothers, qualified bidders with the South Carolina Highway Department, were engaged in road construction and paving projects in many counties in South Carolina. In October 1989, the Thrifts were contacted by federal officials who were engaged in an investigation of the relationship between the Thrifts and the Highway Department. The focus of the federal investigation was on multiple allegations of impropriety involving gifts, gratuities, payment of money to Highway Department officials, and falsification of quality tests on state road construction projects.

Encompassing activities from the early 1980s until July 1991, the initial investigation was directed by the United States Attorney's Office and involved personnel from the Federal Bureau of Investigation, the Internal Revenue Service, and the South Carolina Law Enforcement Division. The federal authorities determined that there would be no federal prosecution and turned their investigative files over to the South Carolina Attorney General's Office which assumed responsibility for state prosecution in the Thrift cases.

The Attorney General's Office reviewed the information and determined that several substantive charges could be made under state law. Although most of the potential charges stemmed from activity in the upstate, the Attorney General exercised prosecutorial discretion by pursuing only those charges which could be prosecuted in coastal Horry County. The Attorney General's Office felt, based on the reputation of the Thrifts and their position in the community, that there was a poor chance of securing a conviction in the upper part of the state. Looking at the overall chances for conviction, the

Attorney General's Office narrowed the focus of the prosecution and consciously chose to pursue the charges in a county where it felt the Thrifts had little influence.[1]

The first indictments were obtained in Horry County in October 1991. Under these indictments: (1) Sam and Tom Thrift and Herman P. Snyder, Chief Highway Engineer, were charged with common law conspiracy, § 16-17-410, conspiracy to violate the state ethics law, § 8-13-490, and conspiracy to violate the Highway Department antibribery statute, § 57-1-60; (2) Tom Thrift was charged with giving Snyder a $2,000 bribe in violation of § 57-1-60 and § 8-13-490; and (3) Snyder was charged with taking a $2,000 bribe in violation of § 57-1-60 and § 8-13-490. Eventually a plea bargain was reached, and on December 9, 1991, the Horry County Grand Jury issued a new indictment charging the three with a general criminal conspiracy, no object specified, in violation of S.C. Code Ann. § 16-17-410.[2] Sam and Tom Thrift pled guilty to this indictment. Tom Thrift also pled guilty to a separate ethics violation pursuant to the agreement.

Two days later, on December 11, 1991, the Attorney General's Office notified the Highway Department in writing that the Attorney General's Office had "now completed its prosecution of Sam Thrift, Tom Thrift, and Herman Snyder. The Attorney General's Office does not plan to seek prosecution of any additional individuals. . . ." After this letter was sent, all of the parties were informed that they could retrieve their documents. It was also clear that the Attorney General's

---

[1] This kind of decision, while certainly within the discretion of a prosecutor, must be approached with caution in that it may be perceived to be predicated on the presumption that th judicial system and jury will fail in areas where power and influence can be applied. Such a policy would set a different prosecutorial standard for the powerful or influential, which tends to undermine the very foundation of justice.

[2] The plea negotiations were motivated in large part by the defense's desire to shorten the period of debarment applied to Thrift Brothers, Inc. The State accommodated this defense request by eliminating the charge of bribery from the indictment. This decision was made in the face of evidence that two state officials were bribed. Instead, the State pursued a generic conspiracy indictment with no specific allegations. The State further agreed that it would not even mention the word "bribery" in its presentation of the plea agreement in open court.

Office then closed its files and turned all discovered documents over to the Highway Department.[3]

On January 20, 1992, the Highway Department and Thrift Brothers, Inc. entered into a debarment agreement which established a definite period of time for the debarment. A portion of this agreement stipulated that the "Thrift Brothers and its officers" would assist the Highway Department in any internal investigations against Highway Department officials for misconduct or violation of rules and regulations.

Effective May 4, 1992, the State Grand Jury Act, S.C. Code Ann. §§ 14-7-1000 *et seq.*, was amended to extend the jurisdiction of the State Grand Jury to crimes involving public corruption. On June 17, 1992, Attorney General Medlock filed a petition with the Presiding Judge of the State Grand Jury requesting authorization, in accordance with S.C. Code Ann. § 14-7-1630, to open the Thrift investigation. Authorization was granted and the State Grand Jury received the first presentation of the Thrift investigation in July 1992.

On July 16, 1992, the State Grand Jury returned the first indictment charging Elbert E. Bowers, a Thrift employee, and Carl Dennis Barnwell, a Highway Department official, with conspiring to take and give bribes. Bowers and Barnwell were also charged with various offenses related to the investigation with unindicted co-conspirators. The unindicted co-conspirators were identified as Respondents Tom, Sam, Glenn, and Gary Thrift, and Respondents Carroll and Wilson, Highway Department officials. A superseding indictment was issued on September 17, 1992 adding charges against Johnny Murdock, and Respondents Wilson, Carroll, and Gilreath, all Highway Department officials. Finally, on November 18, 1992, the third superseding indictment was issued adding Glenn and Gary Thrift as defendants in the conspiracy. The same day, separate indictments charging bribery were also returned against Sam Thrift and Tom Thrift, while Respondent Norman Reeves, a paving contractor was also indicted for "Unlawful Giving of a Thing of Value."

---

[3] During the 1991 prosecution of the Thrifts, the Highway Department suspended Thrift Brothers, Inc. from bidding on any highway projects. The debarment was critical to the Thrifts and the letter from the Attorney General was vital to begin the administrative process which would allow for the company's reinstatement.

Motions were heard before The Honorable Charles W. Whetstone, Jr., on January 7, 12, 14, and 18. On January 22, 1993, the court entered an order which dismissed all Respondents' indictments concluding that:

> [b]ased on the above findings of fact and conclusions of law, the indictments against the following defendants are dismissed: (a) as to the motions argued on the applicability of the plea agreement, the indictments against Sam Thrift, Tom Thrift, Gary Thrift, and Glenn Thrift are dismissed; (b) as to the immunity agreement issue, the indictments against Sam Thrift, Tom Thrift, Gary Thrift, and Rogers Carroll are dismissed; (c) as to the repeal of South Carolina Code Ann. Section 8-13-490, the indictments against Sam Thrift, Tom Thrift, John Gilreath, Joel Wilson and Norman F. Reeves are dismissed; (d) as to the issue of prosecutorial misconduct, the indictments against Sam Thrift, Tom Thrift, Gary Thrift, Rogers Carroll, [John Gilreath, Sr.[4]] and Norman F. Reeves are dismissed; (e) as to the status of the public official argument, the indictments against Rogers Carroll, John Gilreath, and Joel Wilson are dismissed; and (f) as to the charge of conspiracy against Joel Wilson, the alleged acts which constitute the conspiracy are dismissed above and accordingly the conspiracy indictment is also dismissed.

Order of The Honorable Charles W. Whetstone, Jr., dated January 22, 1993. (ROA p. 1)

Following the trial judge's order, the State filed a notice of appeal which was served on January 22, 1993.

## ISSUES

The merits of the State's appeal require us to address the following issues:

1. What was the scope of the Thrifts' earlier plea agreement entered in Horry County?

2. What was the scope of the immunities granted to the various witnesses compelled to testify before the State Grand

---

[4] It should be noted that John Gilreath, Sr. was omitted from the conclusion of the order; however, the body of the order clearly directs the dismissal of the indictment against Gilreath.

Jury, specifically, did they receive "transactional" immunity or "use" immunity?

3. Was the introduction of evidence before the State Grand Jury of John David Gilreath's refusal to take a polygraph so prejudicial as to require dismissal of the indictment against him?

4. Did the legislature repeal provisions of the "old" Ethics Act, specifically S.C. Code Ann. § 8-13-498, by enacting the "new" 1991 Ethics Act?

5. What is the definition of "public official" for purposes of the Ethics Act, the common law, and as applied to the present facts?

## LAW/ANALYSIS

### Standard of Review

We recently reiterated the standard of review in appeals of pretrial rulings in *State v. Amerson,* — S.C. —, 428 S.E. (2d) 871 (1993). In *Amerson,* we held that "[a]ppellate courts are bound by the fact findings in response to motions preliminary to trial when the findings are supported by the evidence and not clearly wrong or controlled by error of law." *Id.* 428 S.E. (2d) at 873; *City of Chester v. Addison,* 277 S.C. 179, 284 S.E. (2d) 579 (1981).

### 1. Scope of the Horry County Plea Agreement

The trial judge dismissed with prejudice all indictments against Respondents Tom, Sam, Glenn, and Gary Thrift on the ground that the State's plea agreement with Sam and Tom Thrift in December 1991 prohibited the State from further prosecution of the Thrifts or their corporations for conspiracy or substantive acts of bribery of Highway Department officials. The issue before us therefore must focus on the terms of the oral plea agreement and their interpretation.

Under the separation of powers doctrine, which is the basis for our form of government, the Executive Branch is vested with the power to decide when and how to prosecute a case. Both the South Carolina Constitution[5] and the South Carolina case law[6] place the unfet-

---

[5] S.C. Const. art. V, § 24.

[6] *McLeod v. Snipes,* 266 S.C. 415, 223 S.E. (2d) 853 (1976).

tered discretion to prosecute solely in the prosecutor's hands. The Attorney General as the State's chief prosecutor may decide when and where to present an indictment, and may even decide whether an indictment should be sought. Prosecutors may pursue a case to trial, or they may plea bargain it down to a lesser offense, or they can simply decide not to prosecute the offense in its entirety. The Judicial Branch is now empowered to infringe on the exercise of this prosecutorial discretion; however, on occasion, it is necessary to review and interpret the results of the prosecutor's actions. We must, therefore, analyze the State's agreement within our judicial constraints.

In its brief, the State posits that since the enforcement of the plea agreement is likened to specific performance of a contract, it falls into equity. As an equity matter, the State argues that we can take our own view of the facts in this appeal. This argument fails because the central question about the plea agreement is what are its terms, which is a legal question. *Baughman v. State*, — S.C. —, 430 S.E. (2d) 505 (1993) (per curiam); *State v. Gates*, 229 S.C. 92, 382 S.E. (2d) 886 (1989). Moreover, the case before the Court is a criminal action at law which also places it within the ambit of *Amerson*. The State conceded at oral argument that the *Amerson* standard of review controls here.

The United States Supreme Court in *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed. (2d) 427 (1971), held that where a guilty plea rests on a promise or agreement which can be said to be a part of the inducement or consideration, then the agreement must be fulfilled. The Fourth Circuit recently addressed this same issue in *United States v. Ringling*, 988 F. (2d) 504 (4th Cir. 1993). In *Ringling*, the court held that a plea bargain rests on contractual principles, and that each party should receive the benefit of the bargain. *Id.*[7]

---

[7] The two most recent South Carolina cases which have dealt with plea agreements are *State v. Gates, supra*, and *State v. Baughman, supra*. Both cases applied contract principles to interpret the language of written agreements, and are consistent with the holding in *Ringling, supra*.

In *Gates*, there was no *Santobello* issue because Gates had not actually pled guilty under the agreement when the solicitor refused to comply. Further, the case turned on the "plain meaning" of a written agreement. *Id.* Again, in *Baughman*, the Court was asked to interpret the written word and its plain meaning. Baughman's agreement specifically used the term "pending"

The court further stated that a plea agreement analysis must be more stringent than a contract because the rights involved are fundamental and constitutionally based. *Id.* The court also noted that the government had to be held to a higher degree or responsibility than the defendant for imprecisions or ambiguities. *Id.*

Another important holding in *Ringling* is that where "one district attorney states that the 'Government' will not prosecute, it encumbers all other districts." *Id.* at 507. The court also stated:

> "[i]t is the Government at large—not specific United States Attorneys or United States 'Districts'—that are bound by plea agreements negotiated by agents of the Government". . . . When a defendant's fundamental rights are at stake the right hand should know what the left hand is doing.

*Id.* at 507.

Whether the plea agreement is wise, or even in the best interests of the state, is not the question before us. The record below supports the factual findings of the trial judge. The Respondents called the three attorneys involved in negotiating the Horry County plea on behalf of the Thrifts. Each attorney testified consistently that the oral plea agreement included a promise not to further prosecute Sam Thrift, Tom Thrift, Gary Thrift, Glenn Thrift, or their corporations. The trial judge also properly found that oral plea agreements are consistent with the day-to-day practice of criminal law in state courts.

The letter written by the Assistant Attorney General, dated December 11, 1991, further supports the trial court's findings that the agreement encompassed Sam Thrift, Tom Thrift, Gary Thrift, Glenn Thrift, and the corporations. This letter to the Highway Department, important to the administrative debarment proceedings, specifically stated:

> This letter is to inform you that the Attorney General's Office has now completed its prosecution of Sam Thrift,

---

charges. *Id.* This is a clear distinction from the present facts. Here, the evidence of the oral agreement creates a factual question as to its contents, and not just an interpretation of the language.

Tom Thrift, and Herman Snyder. The Attorney General's Office does not plan to seek prosecution of additional individuals thus all documents and/or materials supplied ... are released back to the Highway Department.

(ROA p. 1601.)

The Assistant Attorney General who authored the letter and the Deputy Attorney General who co-prosecuted the Horry County case conceded in their testimony below that at the time the plea in Horry County was entered, they believed that it concluded the matter for the Attorney General's Office.

The debarment agreement itself is further evidence that the plea agreement ended all criminal prosecutions arising out of the Thrifts' previous involvement with the Highway Department. The debarment agreement imposed the obligation to cooperate on the Thrifts and even led to their personally notifying the Attorney General about the pending sale of their asphalt plant. In fact, the Thrifts were served with a subpoena to appear before the State Grand Jury while they were seated in the Attorney General's Office discussing the pending sale with him.

The testimony of the Horry County defense attorneys was complete and concise as to the terms of the agreement, while the Assistant Attorney General stated that he had "no recollection" of the agreement. The testimony of the Deputy Attorney General supported the proposition that oral agreements are perfectly enforceable, and that he felt that the Horry County plea agreement closed the file for the Attorney General's Office. Under *Amerson*, we find that the evidence in the record supports the trial judge's order on this first issue. We must, therefore, affirm the trial court's dismissal of the indictments against Tom, Sam, Glenn, and Gary Thrift.

Throughout this case, the State has contended that the plea agreement was not so comprehensive as to relieve the Thrifts from further potential criminal liability. While there is some conflicting evidence, this assertion begs the question. In the Transcript of Record for the Horry County Guilty Plea, the State began its presentation with the words "pursuant to plea negotiations," yet there was no further discussion as to what the plea agreement provided.

At the inception of the State's investigation, the federal au-

thorities had evidence of pervasive misconduct involving the Thrifts. The actual situs of the worst misconduct, the payoffs, the cash gratuities, and the falsified work records, was in the upstate. Armed with this knowledge and other information developed from the Attorney General's own sources, the Attorney General opted to pursue the Thrifts only in Horry County.

Exercising this discretion which rests solely within the powers of the office, the Attorney General chose the time and place for the initial prosecution of the Thrifts and then chose to end that prosecution with a plea bargain. On the present facts, the State's current dilemma is one of its own creation. The State had the opportunity to set forth the scope of the agreement and persons to whom the agreement applied, but did not. We caution both the bench and the bar that this can no longer be an option.

### Appropriate Plea Procedures

Today, the complexity of cases dictates that a reliable record exist containing the specific terms of any plea agreement. We hold, therefore, that effective with this decision, all plea agreements must be on the record and must recite the scope, offenses, and individuals involved in the agreement. We also hold that prospectively for all plea agreements entered after the filing of this opinion, we will limit our reviews of a plea agreement only to those terms which are fully set forth in the record.

In the past, the proper procedure to be utilized by a trial judge in accepting a guilty plea has been the subject of considerable debate within our Court. In a line of cases beginning with *State v. Cross*, 270 S.C. 44, 240 S.E. (2d) 514 (1977) and culminating in *Medlin v. State*, 276 S.C. 540, 280 S.E. (2d) 648 (1981), we attempted to set forth guidelines for the approval by the trial court of a guilty plea bargain between the defendant and the state and to set strict limits upon the trial judge's involvement in any negotiations leading to such a plea.[8] One guiding principle which remained constant in all of

---

[8] See also, *Beaver v. State*, 271 S.C. 381, 247 S.E. (2d) 448 (1978) and *Harden v. State*, 276 S.C. 249, 277 S.E. (2d) 692 (1981).

these opinions was that the terms, conditions, and reasons for any plea agreement must be disclosed to the trial judge. Today, we underline the requirement of disclosure to the court of all aspects of the plea agreement and specifically add the requirement that such disclosure must be made on the record. Adherence to this procedure is the shared responsibility of the trial judge and the trial counsel for the state and the defendant. The effect of our opinion today is that neither the State nor the defendant will be able to enforce plea agreement terms which do not appear on the record before the trial judge who accepts the plea. In the instant matter, the evidence supports the trial judge's finding that the Horry County plea agreement barred further prosecution of the Thrifts and their corporations. *Amerson, supra.* Accordingly, this finding is affirmed.

## 2. The Scope of Immunity Granted for Compelled Testimony

The next issue requires us to examine the scope of the immunities granted to the various Respondents who were compelled to testify before the State Grand Jury. Respondents Sam, Tom, and Gary Thrift, along with Respondent Rogers Carroll, were compelled to testify before the State Grand Jury under an immunity grant.[9]

The grant of immunity has its origins in the Bill of Rights, the first ten amendments to the Constitution of the United States. The framers of the Bill of Rights recognized the dangers inherent in self-incrimination, and as a result, placed the Fifth Amendment a prohibition against compelling a witness to testify against himself. This prohibition against compelled self-incrimination is a basic constitutional mandate which is not a more technical rule, but rather, a fundamental right of every citizen in our free society. To this end, the framers of the South Carolina Constitution extended this same protection in our own State Constitution. S.C. Const. art. I, § 12. The scope of immunity which is granted a witness compelled to testify against himself is intricately woven in the tapestry of both constitutions, and it is against this tapestry that any immunity from prosecution must be examined.

---

[9] John David Gilreath, Sr. appeared before the State Grand Jury, but his testimony was not compelled by the grant of immunity.

Ordinarily, because of the state and federal protection against self-incrimination, the government may not force any citizen to give testimony against himself. If the government desires to obtain a statement from a citizen which might incriminate him, the government has two options. First, it may obtain from the citizen a voluntary waiver of his right of silence. This waiver cannot be forced or coerced, and the citizen must knowingly give such a waiver after being advised of his right to remain silent and his right to counsel. The second option the government has if it desires to require a citizen to testify against himself is to grant the citizen immunity from prosecution.

There are two recognized types of immunity granted by the government to a witness compelled to testify against himself: the broader "transactional" immunity and the more limited "use" immunity. Transactional immunity, as the term implies, shields the witness from *any prosecution* for the transaction or offense to which his compelled testimony relates. See, *Murphy v. Waterfront Commission of New York*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed. (2d) 678 (1964). Use immunity, a fairly modern development in Fifth Amendment law, prohibits the witness' compelled testimony and its fruits from being *used in any manner* in connection with criminal prosecution of the witness. See, *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed. (2d) 212 (1972). Thus, under a grant of use immunity, a potential defendant could be compelled to testify against himself and, nevertheless, be subsequently indicted and prosecuted, provided the information used to obtain the indictment and to prosecute the defendant was obtained by the government from sources completely independent of the witness' compelled testimony. The State in reliance on S.C. Code Ann. § 14-7-1760 (Supp. 1992) argues that the Respondents, Sam, Tom, and Gary Thrift, along with Rogers Carroll, received only use immunity for their testimony before the State Grand Jury. Thus, the State contends these defendants' subsequent indictment by the same State Grand Jury which heard their compelled testimony was proper.

At the outset, the Respondents assert that *In Re: Hearing Before Joint Legislative Committee, Ex parte Johnson*, 187 S.C. 1, 196 S.E. 164 (1938) is controlling.

On strikingly similar facts, where a joint legislative committee charged with the investigation of public corruption in various police agencies compelled the testimony of a witness, this Court held that anything less than transactional immunity was unconstitutional under Article I, Section 12 (formerly § 17), of the South Carolina Constitution. In our interpretation of the state constitutional guarantee of freedom from compelled self-incrimination, we held that the federal interpretation of the Fifth Amendment, while persuasive, was not binding. *Id.*

The dangers enumerated in *Ex Parte Johnson* are still present:

> The immunity is not adequate if it does no more than assure him that the testimony coming from his lips will not be read in evidence against him upon a criminal prosecution. The clues thereby developed may still supply the links whereby a chain of guilt can be forged from the testimony of others. To force disclosure from unwilling lips, the immunity must be so broad that risk of prosecution is ended altogether.

*Id.* at 13, 196 S.E. at 169. Today the evidence derived from use immunized testimony still leads to other facts which can be used independently as a basis for prosecution. The mere prohibition against using the actual words of a witness in a criminal prosecution offers very little constitutional protection. Immunized testimony must be coextensive with the right against compelled self-incrimination, or the right ceases to exist.

The trial court and the State have followed and cited the decision of the United States Supreme Court in *Kastigar v. United States*, 406 U.S. 441, 453 92 S.Ct. 1653, 23 L.Ed. (2d) 212 (1972). This landmark decision of federal constitution law, for the first time, examined the constitutionality of limited "use" immunity in the context of a 1970 statute enacted by Congress creating "use" immunity. *Id.* Under the federal statute, which is similar to the disputed provisions of S.C. Code Ann. § 14-7-1760 (Supp. 1992), a person could be compelled to give up his Fifth Amendment rights and testify before a federal tribunal under a grant of immunity which is limited to a restriction on the use of his testimony or its fruits. *Id.*

In upholding the constitutionality of this statute, the *Kasti-*

*gar* court adopted a system of minimum procedural safeguards for protection of Fifth Amendment rights, whereby a hearing is conducted in which the burden is on the government to demonstrate that its indictment of a "use" immunity defendant is grounded on information totally independent of the immunized testimony. While *Kastigar* appears to allay the fears expressed in *Ex Parte Johnson,* this is only an illusion. The potential for Double Jeopardy problems in prosecutions of use immunized witnesses and the constitutional implications of indictment by the same grand jury which heard use immunized testimony are only a few examples of the issues which continue to plague the federal system. *See United States v. Hinton,* 543 F. (2d) 1002 (2d Cir.), *cert. denied* 429 U.S. 980, 1051, 1066, 97 S.Ct. 493, 764 796, 50 L.Ed. (2d) 589, 767, 783, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed. (2d) 376 (1976); *see also, United States v. Zielenzinski,* 740 F. (2d) 727 (9th Cir. 1984).[10]

The continuing confusion in the federal courts convinces us that the rule in *Ex parte Johnson* is sound and quite necessary to protect the tenets of the South Carolina Constitution. Where the government compels a witness to incriminate himself, then by constitutional necessity, the government must do so at its own peril.

---

[10] The federal courts have attempted to resolve some of the use immunity issues through supervisory powers. In *Hinton,* the Second Circuit adopted a *per se* rule of constitutional proportions which prohibits the same grand jury which hears the use immunized testimony from indicting a use immunized witness. In adopting this rule, the court cited problems with fundamental fairness, and found the procedure "fraught with applicable constitutional problems" as the basis for exercising its supervisory powers over the administration of criminal justice. *Id.* at 1010. The Ninth Circuit in *Zielenzinski,* while rejecting a *Hinton* rule, exercised its supervisory powers to reconcile a similar issue by holding that a remand was proper to determine if evidence was derived from a wholly independent source. In the Fourth Circuit, it was necessary to address the question of the propriety of the same prosecutor's involvement in securing the indictment. In *United States v. Harris,* 973 F. (2d) 333 (4th Cir. 1992), the court held that a prosecutor who was exposed to a previously immunized witness could not participate in that witness' later indictment. Other problems are created where overwhelming publicity surrounds the use testimony given before a different tribunal. *United States v. North,* 910 F. (2d) 843, modified in part, 920 F. (2d) 940 (D.C. Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 2235, 114 L.Ed. (2d) 477 (1991) (Oliver North's convictions were reversed in part and vacated in part where North was compelled to testify before Congress and later indicted in federal court for the same activity about which he had testified).

The State argues that *Ex parte Johnson* was effectively overruled in *S.C. Tax Commission v. Reeves*, 278 S.C. 658, 300 S.E. (2d) 916 (1983) (where a custodian of partnership records could not assert his personal right against compelled self-incrimination). In *Reeves*, we simply did not view the pertinent language in the South Carolina Constitution as prohibiting the disclosure of partnership records. *Id.* As we noted in *Ex parte Johnson*, the freedom from self-incrimination attaches to the individual. In *Reeves*, we held the single partner possessing records in a representative capacity could not rely on his "individual" privilege to avoid producing the partnership's records. In the present instance, the Fifth Amendment, and more specifically the state constitutional right, clearly attaches to the individual Respondents. Our decision in *Reeves* did not overrule *Ex parte Johnson*, and is not controlling on the present facts.

Subsequent to our decision in *Ex parte Johnson*, which established transactional immunity as the constitutional standard in South Carolina, our General Assembly provided for a State Grand Jury and adopted an accompanying immunity statute. In 1987, when the immunity statute was first adopted, it provided the broader "transactional" immunity for compelled testimony. In May of 1992, when the State Grand Jury Act was amended to give jurisdiction over public corruption, the General Assembly also narrowed the immunity provisions to give only "use" immunity for compelled testimony.

The unavoidable dilemma facing us is the conflict between the State Constitution and the new "use immunity" statute in the State Grand Jury Act. The interpretation of the State Constitution announced in *Ex parte Johnson* is dispositive. Article I, § 12 permits only transactional immunity and as such can only be amended by the citizens of South Carolina by referendum. Absent a constitutional amendment, we have no other course but to hold unconstitutional so much of S.C. Code Ann. § 14-17-1700 (Supp. 1992) as restricts the immunity granted a compelled witness before the State Grand Jury to use immunity.[11]

---

[11] The State concedes that the immunity statute, as amended in the State Grand Jury Act, confers a more limited immunity for witnesses compelled to testify before the State Grand Jury than for witnesses compelled to testify

It was uncontroverted that the Respondents, who were compelled to testify under use immunity, were indicted after giving their compelled testimony by the same grand jury that heard their immunized testimony. Evidence was also placed before the trial judge that a witness' demeanor, and even answers which conflict with earlier testimony, can motivate a grand jury to indict an individual. The defense evidence coupled with the timing of the indictments reinforces the fears expressed in *Ex parte Johnson*. Because we hold that only transactional immunity exists under the South Carolina Constitution, we also hold that since the indictments brought against Tom Thrift, Sam Thrift, Gary Thrift, and Rogers Carroll were obtained in violation of their state constitutional rights against compelled self-incrimination, they must be dismissed.[12]

3. Effect of Introduction of Evidence Before the Grand Jury of Gilreath's Refusal to Take a Polygraph

John David Gilreath, Sr., a former District Engineering Administrator with the Highway Department, testified before the State Grand Jury without any grant of immunity. During Gilreath's testimony, the Chief Deputy Attorney General asked him a question which could only be answered by referencing a previously attempted polygraph examination. Gilreath stated that he had refused to take the polygraph.

before county grand juries throughout South Carolina. We observe in passing that this alone raises serious questions as to the constitutionality of the statute under an equal protection analysis.

[12] While it might be argued that justice is frustrated when the State is unable to further pursue public corruption charges against these individuals, it would be far more devastating an injury to our system of justice if such a fundamental constitutional principle as the protection against self-incrimination were trammeled in the process. However, it should be noted that neither the immunity granted by the Horry County plea agreement nor the transactional immunity granted before the State Grand Jury precludes the Highway Department from the further pursuit of debarment proceedings against the respondent Thrifts or Thrift Brothers. In *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed. (2d) 487 (1989), the Supreme Court held that a civil as well as a criminal sanction constituted punishment for double jeopardy purposes only where the sanction as applied served the goal of punishment. A contractor's debarment serves as a remedial measure to insure the protection of the public at large, and not punishment. Where a civil sanction is remedial in nature, and not merely punitive, it does not run afoul of double jeopardy to pursue the civil sanction. *Id.; United States v. Bizzell*, 921 F. (2d) 263 (10th Cir. 1990).

Rather than attempting to stop Gilreath and give a curative instruction as legal advisor to the State Grand Jury, the Chief Deputy continued to question Gilreath about his refusal to take the polygraph. The Chief Deputy then called the polygraph operator to testify before the State Grand Jury. The polygraph operator testified that he advises people to not take the polygraph if they are going to have to lie about something, and that Gilreath had repeatedly refused to take the test.[13] The trial judge found these actions constituted prosecutorial misconduct and were so prejudiced to Gilreath that both charges against him must be dismissed.

It is well settled that any evidence flowing from an experience with a polygraph is inadmissible at trial in South Carolina. *State v. Pressley*, 290 S.C. 251, 349 S.E. (2d) 403 (1986). Whether this type of evidence is admissible before a grand jury is, however, a novel issue. Other courts are divided on this question. *Compare In re Grand Jury Investigation*, 791 F. Supp. 192 (S.D. Ohio 1992) (polygraph results are generally admissible before federal grand juries) *with State v. Woodson*, 551 A. (2d) 1187 (R.I. 1988) (erroneous admission not so prejudicial as to warrant dismissal of indictment). We hold today that polygraph evidence, including evidence that an individual refused to take a test, is inadmissible before South Carolina grand juries.

Ordinarily, we do not inquire into the nature or sufficiency of the evidence before a grand jury. *State v. Williams*, 301 S.C. 369, 392 S.E. (2d) 181 (1990); *State v. Williams*, 263 S.C. 290, 210 S.E. (2d) 298 (1974). An exception to this general rule exists where, as here, a defendant makes a colorable claim of prosecutorial misconduct.

It is usually difficult for a defendant to make such a claim. The Court of Appeals in *State v. Thompson*, 305 S.C. 496, 409 S.E. (2d) 420 (Ct. App. 1991), held that, "[s]peculation about 'potential' abuse of grand jury proceedings cannot substitute for evidence of *actual* abuse as grounds for quashing an otherwise lawful indictment." *Thompson*, 305 S.C. at 502, 409 S.E.

---

[13] Gilreath states that the reason for his refusal was that the questions to be used on the polygraph exam exceeded the scope of what he was prepared to answer. Gilreath asserts that he felt the State was out to ambush him. Regardless, the reasons are irrelevant as to the propriety of questioning him about the polygraph.

(2d) at 424. [Emphasis in the original.] Fortunately, given the nature of State Grand Jury proceedings, there is a complete record available for analysis.

As noted above, the court will only entertain this type of challenge to an indictment where there is a colorable claim of prosecutorial misconduct. Where as here, there is a colorable claim of prosecutorial misconduct in the grand jury proceeding, the next inquiry is whether the defendant was sufficiently prejudiced by the admission of the evidence so as to warrant dismissal of the indictment.

Here, the trial court found prosecutorial misconduct and prejudice. We reverse the finding of misconduct under the facts and circumstances of this case. The Chief Deputy Attorney General faced a novel issue of law in deciding whether to present the polygraph evidence. The fact that we now hold this type of evidence inadmissible does not detract from the fact the record discloses absolutely no evidence of any improper motive or improper conduct on the part of the Chief Deputy Attorney General or any of the other Deputy or Assistant Attorneys General who worked on the Thrift case. Quite to the contrary, the record demonstrates that the Attorney General and the Attorney General's staff handled the Thrift matter in complete good faith and in accord with the highest of ethical and professional standards. This is a new and complex area of criminal law for South Carolina prosecutors. It is understandable that mistakes will be made as the State Grand Jury system is implemented.

Although we find no prosecutorial misconduct here, we nonetheless address the prejudice prong because of the colorable claim of prosecutorial misconduct and the unique procedural posture of this case. We find that the presentation of this evidence was severely prejudicial to Respondent Gilreath. The inference that Gilreath was afraid the polygraph exam would expose him as a liar, and that he was guilty, was inescapable. We affirm the trial court's finding of prejudice. *Amerson, supra.*

A difficult issue is what remedy should be applied. In *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed. (2d) 228 (1988), the Supreme Court held that the dismissal of an indictment for nonconstitutional error was only appropriate if it was established that the violation sub-

stantially influenced the grand jury's decision to indict, or there is a grave doubt that the decision to indict was free from substantial influence of such violations. *Id.*[14]

The present facts are well within the parameters established in *Bank of Nova Scotia.* Under the *Amerson* standard, the extensive testimony elicited about the polygraph refusal, especially without any instruction to the State Grand Jury, coupled with the State's acknowledgment of the weakness in its case against Gilreath, support the trial judge's finding of prejudice sufficient to warrant dismissal of the indictment.[15]

### 4. Legislative Repeal

The next issue raised by the trial judge's order is whether the legislature implicitly repealed the provisions of the "old" Ethics Act, specifically S.C. Code Ann. § 8-13-490, by enacting the "new" 1991 Ethics Act. The trial judge dismissed the Ethics Act indictments against Sam and Tom Thrift, of Thrift Brothers, N.F. Reeves, a paving contractor, John Gilreath, a Highway Department official, and Joel Wilson, a Highway Department official, on the grounds that the "old" Ethics Act was impliedly repealed by the "new" Ethics Act.

The 1991 Ethics Act does not contain an explicit provision concerning the repeal of § 8-13-490, and there is no savings clause addressed to § 8-13-490. The 1991 Ethics Act reenacts in a different article a more comprehensive series of statues which address in greater depth the conduct formerly violative of § 8-13-490. *See* S.C. Code Ann. §§ 8-13-700 *et seq.* (Supp. 1992). The trial court ruled that the "old" Ethics Act was impliedly repealed by the "new" Ethics Act and that "the Legislature did not intend that any prosecution under [the old Ethics Act] would continue after its repeal." Order of Judge

---

[14] It is interesting to note that the Sixth Circuit in *United States v. Murray,* 784 F. (2d) 188 (6th Cir. 1986), held that the mention of a polygraph at trial by a federal investigator was prejudicial and therefore reversible error where the record indicated that proof of guilt was not overwhelming. This decision was made even though the jury was instructed to disregard any reference to the polygraph. *Id.*

[15] It is noteworthy that a grand jury was originally used to protect the citizenry from abuses by the crown. The evolution in the United States was to serve the same purpose. The prosecutor should present the evidence and instruct on the law. The grand jury is more than a mere instrument of the prosecution.

Charles W. Whetstone, Jr., p. 27, dated January 22, 1993 (ROA p. 1). We must decide whether the General Assembly intended to grant what would amount to amnesty for all violations of the "old" Ethics Act occurring prior to January 1, 1992, the effective date of the "new" Ethics Act.

In *Independence Ins. Co. v. Independent Life & Acc. Ins. Co.*, 218 S.C. 22, 61 S.E. (2d) 399 (1950), we hold that an enactment of revisions designed to embrace an entire subject of legislation operates to repeal acts which deal with the same subject matter. This role receives further refinement in *Lewis v. Gaddy*, 254 S.C. 66, 173 S.E. (2d) 376 (1970). In *Lewis*, the Court stated that repeal by implication was not favored, and that the law should not be construed as impliedly repealed unless there is not other reasonable alternative. *Id.*

On the present facts, it is argued that the "new" Ethics Act impliedly repeals the "old." The problem with that analysis is that *Lewis* also stands for the proposition that all rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonable discovered in the language used as it is construed in the light of the intended purpose. Moreover, it would defeat the entire *Lewis* analysis if a statute was impliedly repealed without an examination of the legislative intent as espoused in the new legislation.

Looking at the plain meaning of the 1991 Ethics Act, the unambiguous language of the "new" Act clearly states the legislative intent is to amend the "old" Act rather than to repeal it. In addition, there are other specific provisions in the Act which were expressly repealed. *See, e.g.*, S.C. Code Ann. § 8-3-20 (Supp. 1992). The language of the Act also evidences a legislative understanding of the difference between amendment and repeal.[16]

To define the purpose of the 1991 Ethics Act, one need look no further than the preamble. *See City of Spartanburg v.*

---

[16] We are mindful that the South Carolina Code Annotated contains a notation in the 1992 supplement that §§ 8-13-410 through 8-13-500 are repealed by 1991 Act No. 248, § 3. The 1991 Act No. 248 contains no such express repealer. We take judicial notice that it is the current practice of the Code Commissioner to place this type of repealer language in the Code; however, we hold today that this notation is not dispositive. As we find in our analysis, it cannot be the intent of the legislature to immunize or grant amnesty to a defendant simply because of his timing in committing an ethics violation.

*Leonard,* 180 S.C. 491, 186 S.E. 395 (1936) (preamble of any act may be used as a guide in determining legislative intent). The preamble provides that the purposes of the Act include the fostering of public trust and confidence in government, and the promotion of the integrity of government through openness. Given the overall climate[17] in which the legislation was amended and the more stringent guidelines set forth in the new Act, it is apparent that the legislature did not intend to permit someone to escape prosecution for acts of bribery or similar activity committed prior to the amendment of the legislation. We find persuasive the State's argument that to allow a defendant this safe harbor from prosecution based on an *implied repeal* completely frustrates the legislative purpose and intent in enacting the later legislation.

The Respondents argue that in *State v. Defee,* 246 S.C. 555, 144 S.E. (2d) 806 (1965), and in *State v. Spencer,* 177 S.C. 346, 181 S.E. 217 (1935), we held that the absence of a savings clause was fatal to continuing prosecutions under a repealed statue. *See also State v. Patterson,* 220 S.C. 269, 66 S.E. (2d) 875 (1951); *Vaughn v. Kalyvas,* 288 S.C. 358, 342 S.E. (2d) 617 (Ct. App. 1986).

In the cases which dismissed indictments, the court presumed that the statute in question had been repealed. In all of the cited cases which resulted in dismissals of the indictment, the defendants committed criminal acts which were decriminalized by later legislation. Under that factual scenario, there was no other logical way to reconcile the legislation. In the case at bar, there has been no decriminalization; rather, the new statutory scheme sets out more stringent and focused provisions regarding what constitutes criminal conduct.

Respondent Norman Reeves raises two additional sub-issues which must be addressed. The first is that if the "old" Ethics Act charges are still viable, then the "old" Act: (1) requires the Ethics Commission to refer a complaint to the At-

---

[17] The adoption of this legislation followed quickly on the heels of "Operation Lost Trust." "Operation Lost Trust" was an extensive federal investigation of public corruption which resulted in the indictment and prosecution of various senior members of State Government. The General Assembly recognized the serious effect of the investigation and noted that because the public's trust was essential for government to function effectively, the use of any threats, favoritism, undue influence, or other impropriety would undermine the public's confidence. Act No. 248, 1991 S.C. Acts 1579.

torney General before any prosecution can be maintained, and (2) requires that any complaint filed with the Commission must be raised within a three-year statute of limitations. Since these conditions were not met, Reeves argues that the trial court's dismissal of the indictment should be upheld.

The State argues that if the statute is read to require Ethics Commission referral on every prosecution, then it is violative of Article V, § 24, of the South Carolina Constitution. Article V, § 24 provides in part that, "[t]he Attorney General shall be the chief prosecuting officer of the State with authority to supervise the prosecution of all criminal cases in courts of record." The constitutional provision is dispositive that any requirement which places the authority to supervise the prosecution of a criminal case in the hands of the Ethics Commission is unconstitutional. As noted earlier in the plea agreement issue, the prosecution has wide latitude is selecting what cases to prosecute and what cases to plea bargain. This power arises from our State Constitution and cannot be impaired by legislation.

Recognizing the constitutional implications of the State's argument, we note that the entire constitutional issue is avoided by recognizing the civil nature of the Ethics Act complaint. The older scheme allowed for a civil evaluation by the Ethics Commission prior to any criminal referral by the Ethics Commission; and with a narrow reading, the statute does not run afoul of the State Constitution. We adopt this narrow construction.

In light of our narrow construction of the statute, neither issue raised by Reeves has merit. The statute of limitations applies only to the civil complaint before the Ethics Commission, and the referral system only applies to civil complaints to the Ethics Commission which are referred by it to the Attorney General for criminal prosecution. The absence of a complaint to the Ethics Commission will never operate as a limitation upon the State's independent right to initiate a criminal prosecution. Both statutory provisions are inapplicable on these facts. Therefore, so much of the trial judge's order which held that the "old" Ethics Act had been impliedly repealed must be reversed. The indictments against Respondents, Sam and Tom Thrift, N.F. Reeves, John Gilreath, and Joel Wilson, were properly brought under the

"old" Ethics Act and would remain viable, absent any other limitations, for prosecution.[18]

5. The Definition of Public Official

At common law, one must be a public official in order to ■ be prosecuted for misconduct in office. *State v. Hess*, 279 S.C. 14, 301 S.E. (2d) 547 (1983); *see, State v. Furey*, 128 N.J. Super. 12, 318 A. (2d) 783 (1974); *State v. Begyn*, 34 N.J. 35, 167 A. (2d) 161 (1961); *State v. Weleck*, 10 N.J. 355, 91 A. (2d) 751 (1952); *see also* McAnnich and Fairey, *The Criminal Law of South Carolina*, 453 (2d ed. 1989). There is much discussion in the briefs and before the trial judge as to how South Carolina defines a public official for purposes of common law criminal prosecution. The trial judge dismissed the indictments for common law misconduct in office against John Gilreath, Joel Wilson, and Rogers Carroll, all officials with the Highway Department, holding that they were public employees and not public officials.[19] Answering the question, what is a public official at common law, requires us to examine some of the various definitions applied to misconduct in office.

In *State v. Hess, supra,* we found that a police chief, a senior official of a municipality, was a public official. In analyzing the common law crime of misconduct in office, we held that Hess' nonelected position as the Chief of Police was sufficient to sustain his conviction for common law misconduct in office. *Id.* The rule enunciated in *Hess* was that a conviction for miscon-

---

[18] These indictments against Sam and Tom Thrift must be dismissed because of our ruling set forth in parts one and two above. The indictments against Reeves and Wilson remain in place. The indictment against Gilreath must be dismissed for other reasons set forth in part three above.

[19] By way of contrast, it should be remembered that under the "old" Ethics Act, the disputed § 8-13-490 does not require that the person giving or receiving anything of value to be an official. The statute provides:

[n]o person shall offer or give a member or employee of a governmental regulatory agency or department ... and no member or employee of [a governmental regulatory] agency or department shall solicit or accept ... anything of value, or a favor or service, while the member or employee is associated with the regulatory agency or department.

S.C. Code Ann § 8-13-490 (1986). Therefor, as to Respondents Reeves, Gilreath, and Wilson, who were charged under the "old" Ethics Act, there is not statutory requirement that they be "public officials" in order to be charged thereunder. The statutory offense created by the Ethics Act in no way impacts on our analysis of the common law crime of misconduct in office.

duct in office required the existence of a duty owed to the public.

In *Sanders v. Belue*, 78 S.C. 171, 58 S.E. 762 (1907), a superintendent appointed by a county board was held to be a public officer. In deciding *Sanders*, we established the distinction between a public officer, one who is charged with exercising some sovereign power in the performance of his duties, and an employee, one who merely performs duties under the direction of an employer. *Id.* An important factor in our *Sanders* analysis was that the public be concerned about the performance of the official duties. *Id.* In *State v. Crenshaw*, 274 S.C. 475, 266 S.E. (2d) 61 (1980), we examined the duties of a city police officer and found him to be within the scope of a public official. Again, a common thread lies in the exercise of the powers of or representation of the sovereign.

In *State v. Wannamaker*, 213 S.C. 1, 48 S.E. (2d) 601 (1948), we looked specifically at the Highway Department. In *Wannamaker*, we examined the extent the defendant's duties pertained to the public interest. A reading of the common law definitions of public official shows the greater the duty to the public at large, the more likely it is that the individual will be a public official.

Under the applicable definition of a public official for common law misconduct in office as set forth in *Hess, supra*, the case at bar is not a close call factually. Although not appointed or elected to office by the public or specific arm of the government, the duties of the indicted Highway Department officials were of great concern to the public at large. Each official indicted had control over matters falling under the sovereign powers of the state. The public funds under the control of each official were also significant. Duties involving highway safety and large amounts of public funds can be held to have no less public impact than the duties of the police chief in *Hess*. Accordingly, the trial judge erred in finding that Gilreath, Wilson, and Carroll were not public officials subject to prosecution for common law misconduct in office.[20]

---

[20] Gilreath's indictments are, however, dismissed by reason of our ruling in part three above, and Carroll's by virtue of our holding in part two above.

## CONCLUSION

The trial court's order dismissing all indictments against Tom, Sam, Glenn, and Gary Thrift on the grounds that the State agreed in December of 1991 to end all prosecution of the Thrifts and their corporation for all illegal acts involving the Highway Department is affirmed.

Tom, Sam, and Gary Thrift, and Rogers Carroll were compelled to testify before the State Grand Jury under a grant of immunity, which gave them transactional immunity provided for by the South Carolina Constitution. Accordingly, the trial judge's order is affirmed as modified on the question of immunity; and thus, Tom, Sam, and Gary Thrift and Mr. Carroll are immune from further prosecution for the transactions about which they testified.

The trial judge, in the body of his order but not in the conclusion, dismissed the indictments against John Gilreath, Sr. on the ground that the State had improperly introduced evidence of Gilreath's refusal to take the polygraph and thus tainted the indictments with inadmissible evidence. We agree and affirm as modified on this issue;[21] however, we provide our own analysis. We reverse the trial court's finding of prosecutorial misconduct.

In a related matter, the trial judge dismissed the indictments as to Reeves on the grounds of prosecutorial misconduct. There is no finding in the order which specifies what the prosecution did regarding Reeves. Given the posture of the briefs, the arguments before us, and the absence of Gilreath's name from the trial court's conclusion, it is evident that the dismissal of Reeves was a scrivener's error. We, therefore, reverse the dismissal on this ground as to Reeves.

The trial judge dismissed the Ethics Act indictments against Sam and Tom Thrift, N.F. Reeves, John Gilreath, and Joel Wilson on the grounds that the "old" Ethics Act was impliedly repealed by the "new" Ethics Act. We find that the trial judge erred in his conclusion and hold that indictments under the "old" Ethics Act remain viable as a basis for prosecution of Reeves and Wilson. We must, therefore, reverse this ruling.

---

[21] We further note that although we found no prosecutorial misconduct, we offer no opinion on whether the State may seek to obtain a new indictment against Gilreath for the charge.

The trial judge dismissed the indictments for common law misconduct in office against John Gilreath, Joel Wilson, and Rogers Carroll on the grounds that they were merely public employees. In accordance with our earlier analysis, this ruling must be reversed.[22] In light of our holding, we need not address the remaining issues raised by the State.

Accordingly, the decision of the trial judge is affirmed in part and reversed in part.

---

[22] As with our previous conclusion, although we have found no prosecutorial misconduct, the issue of whether Gilreath may also be reindicted for this charge is not before us.