569 S.E.2d 340

**The STATE, Respondent,**

v.

**Margaret BREWER, Appellant.**

**No. 25516.**

Supreme Court of South Carolina.

Heard June 26, 2002.

Decided Aug. 19, 2002.

Rehearing Denied Sept. 18, 2002.

Richard A. Harpootlian, of Richard A. Harpootlian P.A., of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Attorney Generals Tracey C. Green and Jennifer D. Evans, of Columbia, for respondents.

Justice MOORE.

Appellant was convicted of one count of misconduct in public office and nine counts of embezzlement. In this appeal, we are asked to determine whether the trial court erred by finding appellant is not entitled to immunity from prosecution. We affirm.

## FACTS

Appellant worked for the City of Manning as a billing clerk. Her duties included the collection of money received to pay water bills, the bank deposits of those payments, and the making of adjustments to water bills, for instance, where a customer had a large water bill solely because a leak had occurred. Bill payments were accepted by one of four methods: mail, night deposit box, in person, or bank draft. All payments received were to be posted to the customers' ac-

counts immediately upon receipt. After appellant reviewed the payments, she would post them into the computer system or give them to an employee for posting. The posting would automatically record the amount and form of payments onto the Daily Register Report. Appellant generated this report unless she was on leave.

In February 1997, a city employee discovered appellant was failing to post deposits. Thereafter, in March, appellant was placed on administrative leave with pay while an internal investigation took place.

After the financial problems arose, the City retained an attorney, who in turn retained an accountant, Marty Ouzts, to conduct a review of the water billing system. The review began on April 17, 1997. Ouzts spoke to the other water department employees and reviewed the Daily Reports and the water and sewer billing. During his review between April 17 and April 24, Ouzts found discrepancies in the deposits between the amount of cash collected and the amount of cash deposited for each and every day he looked at in sporadic periods. He further found that appellant printed the Daily Reports and made the bank deposits. Before speaking to appellant, Ouzts determined cash was missing from the deposits. Further, he knew there was a problem because there was no explanation as to why thousands of dollars in cash would be received in a given day and only several hundred dollars of that cash would be deposited the next day.[1]

As a result of Ouzts' initial investigation, appellant, appearing with her attorney, was compelled to attend a meeting on April 24, 1997. She was informed if she did not attend the meeting, her employment would be terminated. She met with the Mayor of Manning, the city administrator, a town councilman, Ouzts, and the City's retained attorney. Ouzts testified the meeting was to determine why there were discrepancies in the deposits and Daily Register Reports.

---

1. Appellant allegedly held checks so they would not be posted on the computer system as payments and would not appear on the Daily Report. She then took cash in an amount equal to the checks she had withheld. When she withheld the checks received in the mail, her actions prevented those checks from being posted as payments. Therefore, to ensure the customers' accounts would not reflect an arrearage, appellant made adjustments to the accounts before the bills were sent.

At the meeting, Ouzts and appellant discussed what would cause differences in the amounts recorded for the deposit and the Daily Register Report. Appellant made the following statements: (1) she did not know what would cause the differences between the Daily Reports and the actual deposits made; (2) she had never used the Daily Report to ensure that it matched the deposits; (3) she never noticed there was a discrepancy in the amounts; (4) she never noticed the Daily Report listed the amount of checks received and the amount of cash received; (5) when asked why her reports balanced exactly to the penny (which is extremely unusual), she said she did not think that was unusual and that she had made sure her deposit and the Daily Report balanced to the penny every day; (6) she made the deposits; (7) she never had an overage or a shortage when making deposits; (8) she said other employees must be juggling the amounts for checks and cash received; (9) she never noticed that cash being deposited was less than the amount of cash being received; (10) when asked about adjustments to individual accounts, she said other employees could have made adjustments to the accounts while she was in her office doing other things; (11) that she was not aware of other employees making adjustments to individual accounts; and (12) that she was the one who should have made all adjustments to the customers' accounts.[2] Ouzts stated his final report after his investigation would have been the same even if he had not spoken to appellant at the April 24th meeting.

Following the meeting, Ouzts attempted to determine whether there was information that would corroborate or contradict what appellant had stated. Ouzts related his findings to the SLED agent, who became involved after the April 24th meeting on request of the Mayor,[3] and to the state grand jury.

---

2. At trial, appellant's testimony reiterated statements numbered 2, 3, 5, 6, 9, 10, and 12.

3. SLED was contacted the day after appellant's meeting with city officials and Ouzts. The letter contacting SLED states, While we do not have direct evidence which establishes that the funds were taken by a specific individual, we believe an investigation by SLED is warranted.

The City's retained attorney, Charles Boykin, who was also at the April 24th meeting, testified at the pre-trial hearing. He testified the City was initially conducting an internal investigation and law enforcement had not been contacted prior to the meeting. He stated there was no discussion of immunity or of a criminal investigation during the meeting. Boykin testified that appellant could have refused to speak with the officials but they did not inform her she did not have to speak with them. Boykin contended appellant was compelled to attend the meeting for the purpose of satisfying an employment law requirement that before the employee can be terminated, she must be allowed to respond to the allegations against her. He stated the meeting was also for appellant to have the opportunity to respond to any questions posed by Ouzts. Boykin testified appellant was never told that if she did not answer questions she would be fired. She was told, however, that she would be fired if she did not attend the meeting because she had an obligation to cooperate with the City. He further testified that, prior to the meeting, he knew funds were missing; that Ouzts had already completed an analysis of the financial documents for 1996; and Ouzts had explained to him how the embezzlement scheme operated. Before the meeting, Boykin said he would have advised the City to dismiss appellant from employment and refer the matter to SLED whether the meeting took place or not. Within days of the meeting, appellant's employment was terminated.

Following appellant's termination, the State brought criminal charges against her for embezzlement and misconduct in public office. Prior to trial, appellant moved that she be granted immunity from prosecution because she was allegedly coerced into making incriminating statements at the April 24th meeting between her and city officials. The motion was denied.

The trial court ruled the federal and state laws of immunity did not extend to appellant and that there was no basis to quash or dismiss the indictment against her. However, the court found appellant's statements were coerced and not voluntarily made. In making this determination, the court indicated it was analyzing the statements, as it normally would do

in a *Jackson v. Denno*[4] hearing. Consequently, the court ruled appellant's statements during the April 24th meeting should be suppressed and could not be used at trial.

## ISSUE

Whether appellant is entitled to immunity from prosecution?

## DISCUSSION

■ Appellant argues she is entitled to transactional immunity because her April 24th statements were compelled.[5] Transactional immunity shields the witness from any prosecution for the transaction or offense to which her compelled testimony relates. *State v. Thrift,* 312 S.C. 282, 440 S.E.2d 341 (1994).

■ Initially, we note that while appellant was compelled to answer questions during the April 24th meeting, her statements at that meeting were not incriminating, but were exculpatory.[6]

---

4.   378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

5.   Appellant further argues she is entitled to use immunity, which prohibits the witness's compelled testimony and its fruits from being used in any manner in connection with criminal prosecution of the witness. However, as we stated in *State v. Thrift,* 312 S.C. 282, 297, 440 S.E.2d 341, 349 (1994), the South Carolina Constitution provides broader protection by permitting transactional immunity, rather than use immunity. *Id.* at 300, 440 S.E.2d at 351. *See also Dickerson v. Coca-Cola Bottling Co. Affiliated Ltd.,* 312 S.C. 264, 440 S.E.2d 359 (1994) (same). Therefore, it is unnecessary to address appellant's use immunity argument given that, if appellant is entitled to immunity at all, she would be entitled to transactional immunity.

6.   Because these exculpatory statements were not made during a custodial interrogation, the prosecution was not barred from using these statements at trial. *See Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) ( ... prosecution may not use statements, whether exculpatory or inculpatory, stemming from *custodial* interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers *after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*) (emphasis added); *State v. Ridgely,* 251 S.C. 556, 164 S.E.2d 439 (1968) (same). Consequently, the trial judge's suppression of appellant's statements gave appellant relief to which she was not entitled.

Even assuming appellant's statements were incriminating, she would not be entitled to transactional immunity. At the time appellant responded to questions by the accountant hired to investigate the embezzlement scheme, a prosecuting authority was not involved in the matter, there was no agreement between a prosecuting authority and appellant promising her immunity, and there was no testimony involved such that appellant was being asked to testify.

Further, appellant's claim she should be granted immunity from prosecution conflicts with the very nature and purpose of the immunity from prosecution doctrine.

The purpose of immunity provisions is to aid *prosecuting officers* by inducing criminals or their confederates to turn state's evidence and tell on each other; to enable *prosecuting officers* to procure evidence which would otherwise be denied to them because of the constitutional right against self-incrimination; and at the same time to protect every person from giving testimony that directly or indirectly would be helpful to the prosecution in securing an indictment or a conviction.

21 Am.Jur.2d *Criminal Law* § 271 (1998) (emphasis added). *See also Dickerson v. Coca-Cola Bottling Co. Affiliated Ltd., supra* (primary purpose for immunity is to assist prosecutors in obtaining evidence that could otherwise be withheld by witnesses who invoke Fifth Amendment privilege against self-incrimination). The instant case does not involve the situation where a prosecutor was attempting to induce appellant to turn state's evidence and tell on someone else regarding the embezzlement scheme. Further, evidence of the embezzlement scheme was not denied to the prosecutor because, even without appellant's statements, the accountant had already determined that an embezzlement scheme was occurring and the method by which it was being carried out. Consequently, the prosecution had another source by which it procured evidence regarding the scheme.

---

*Cf. State v. Amerson*, 311 S.C. 316, 320, 428 S.E.2d 871, 873 (1993) ( [a]ppellate courts are bound by fact findings in response to motions preliminary to trial when the findings are supported by the evidence and not clearly wrong or controlled by error of law.).

Accordingly, the trial judge properly denied the motion to dismiss or quash the indictment because appellant was not entitled to immunity from prosecution.

**AFFIRMED.**

TOAL, C.J., WALLER, BURNETT and PLEICONES, JJ., concur.