**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Gerald Akeem Gadsden, Appellant.

Appellate Case No. 2016-001286

———————

Appeal From Greenville County
James R. Barber, III, Circuit Court Judge

———————

Unpublished Opinion No. 2019-UP-264
Heard June 6, 2019 – Filed July 17, 2019

———————

**AFFIRMED**

———————

Appellate Defender David Alexander, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior Assistant Deputy Attorney General William M. Blitch, Jr., Assistant Attorney General Jonathan Scott Matthews, all of Columbia, and William Walter Wilkins, III, of Greenville, for Respondent.

———————

**PER CURIAM:** Gerald Akeem Gadsden appeals his convictions for armed robbery, conspiracy, and two counts of kidnapping, on the ground that the circuit court

improperly prevented him from cross-examining a witness, Damon Riley, about the status of Riley's probationary sentence. Gadsden also asks us to vacate his sentence of life without parole (LWOP) for the armed robbery and kidnapping charges and remand for resentencing on the ground that the circuit court erred in refusing to consider his motion to strike LWOP as a possible sentence. We affirm.

Gadsden and James D.L. White were tried together for crimes related to the January 20, 2014 robbery of an Olive Garden in Greenville. The State theorized the robbery was an inside job, and that White—employed as a dish washer at the restaurant—had propped open the front door after closing time to allow Gadsden to enter and steal money from the restaurant's safe. Riley, another Olive Garden employee, testified he left before the robbery occurred and the door was not propped open when he departed. Minutes after Riley left, the restaurant was robbed. While inside the Olive Garden, the robber approached the restaurant manager, struck the manager several times, and demanded money from the safe. Officers responded and found a dish rag propping open the front door, the restaurant's exterior camera monitor disabled, and White inside the restaurant with other employees. Gadsden was eventually identified as the suspected robber, due in part to highly incriminating communications between Gadsden and White found on White's cell phone, pictures found on the phone that Gadsden sent to White the day after the robbery that depicted Gadsden displaying a large amount of cash, as well as witness descriptions of the robber matching Gadsden's features and clothing.

1. We find the trial court erred in limiting Gadsden's cross-examination of the State's witness, Riley. *See State v. Graham*, 314 S.C. 383, 385, 444 S.E.2d 525, 527 (1994) ("Specifically included in a defendant's Sixth Amendment right to confront the witness is the right to meaningful cross-examination of adverse witnesses."); Rule 608(c), SCRE ("Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced."); *see also State v. Brown*, 303 S.C. 169, 171, 399 S.E.2d 593, 594 (1991) ("The Confrontation Clause guarantees a defendant the opportunity to cross-examine a witness concerning bias."); *Smalls v. State*, 422 S.C. 174, 182–83, 810 S.E.2d 836, 840 (2018) ("Evidence of a witness's bias can be compelling impeachment evidence, and for that reason 'considerable latitude is allowed' to defense counsel in criminal cases 'in the cross-examination of an adverse witness for the purpose of testing bias.'" (quoting *Brown*, 303 S.C. at 171, 399 S.E.2d at 594)).

Gadsden's co-defendant, White, initially questioned Riley about Riley's prior burglary charge, and asked Riley whether he had a "recent probation violation." Riley testified he had not had a recent violation and that he had "fulfilled all [of his]

probation and everything." When Gadsden cross-examined Riley, Riley testified he was on probation for burglary at the time he was interviewed by investigators about the Olive Garden robbery. Then, Gadsden attempted to introduce into evidence a "Consent Order Imposing Additional Conditions of Probation," signed by Riley, which was dated February 19, 2014, and detailed two probation violations that Riley had committed. Gadsden argued the Consent Order was appropriate impeachment evidence and evidence of "character and bias." The trial court sustained the State's objection to the Consent Order.

"Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *State v. Pipkin*, 359 S.C. 322, 327, 597 S.E.2d 831, 833 (Ct. App. 2004) (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)). "Rule 608(c), SCRE, preserves South Carolina precedent holding that generally, anything having a legitimate tendency to throw light on the accuracy, truthfulness, and sincerity of a witness may be shown and considered in determining the credit to be accorded his testimony." *State v. McEachern*, 399 S.C. 125, 141, 731 S.E.2d 604, 612 (Ct. App. 2012) (internal quotations omitted). Still, "trial judges may impose reasonable limits on such cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, witness's safety, or interrogation that is repetitive or only marginally relevant." *State v. Jenkins*, 322 S.C. 360, 364, 474 S.E.2d 812, 814 (Ct. App. 1996). "However, before a defendant can be prohibited from attempting to demonstrate bias on the part of a witness, the record must clearly show that the cross-examination is somehow inappropriate." *Id.* at 364, 474 S.E.2d at 814–15. "The limitation of cross-examination is reversible error if the defendant establishes he was unfairly prejudiced." *Brown*, 303 S.C. at 171, 399 S.E.2d at 594.

The circuit court erred in preventing Gadsden from introducing Riley's consent order under Rule 608(c), SCRE and eliciting further testimony from Riley concerning his probation. *See* Rule 608(c), SCRE ("Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced."). Because Riley was on probation and had violated it around the time that he was providing the investigators information regarding the Olive Garden robbery, we believe the Consent Order should have been admitted and further cross-examination allowed because Riley's suspended sentence furnished a motive for him to curry favor with the investigators and otherwise reduce his exposure to imprisonment. However, we do not believe Gadsden suffered unfair prejudice from the trial court's limitation of his cross-examination of Riley, and hold the error was harmless beyond a reasonable doubt. *See State v. Whitner*, 380 S.C.

513, 520, 670 S.E.2d 655, 659 (Ct. App. 2008) ("'[A] violation of the defendant's Sixth Amendment right to confront the witness is not *per se* reversible error,' and we must determine if the 'error was harmless beyond a reasonable doubt.'" (quoting *Graham*, 314 S.C. at 386, 444 S.E.2d at 527)). "Error is harmless when it could not reasonably have affected the trial's outcome." *Id.* Whether error is harmless depends on the facts of each case and a variety of factors, including: "(1) the importance of the witness's testimony in the State's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the State's case." *Id.*

While Riley was undoubtedly an important witness in the State's case—as he was the last person to leave the building before the robbery, and only his testimony could establish that the rag was not in the door until after Riley left—significant portions of his testimony were corroborated by Sergeant Weiner, who testified about: (1) the surveillance video that showed Riley leaving the restaurant at 11:18 p.m., indicating the Olive Garden outside camera monitor was not disabled until after Riley left, but before the robbery occurred; and (2) his interview with White, and White's inconsistent statements about the source of the cash he told Riley he made at a rap concert that weekend. Moreover, Riley testified at several points during trial that he had a prior burglary conviction and had been on probation for that charge. The State's case against Gadsden was strong and included the data and photographs found on two cell phones, the timing of the robbery, and the victims' descriptions of the robber. Riley's testimony did little to incriminate Gadsden directly. Accordingly, we find any error in the trial court's limitation of Gadsden's cross-examination of Riley was harmless beyond a reasonable doubt.

2. We find the trial court did not err in its consideration of Gadsden's motion to strike LWOP as a possible sentence. *See Ex parte Littlefield*, 343 S.C. 212, 218, 540 S.E.2d 81, 84 (2000) ("The South Carolina Constitution and case law place the unfettered discretion to prosecute solely in the prosecutor's hands."); *id.* at 218–19, 540 S.E.2d at 84 ("Prosecutors may pursue a case to trial, or they may plea bargain it down to a lesser offense or they may simply decide not to prosecute the offense in its entirety." (quoting *State v. Thrift*, 312 S.C. 282, 291–92, 540 S.E.2d 341, 346 (1994))); *id.* at 219, 540 S.E.2d at 84 ("Although prosecutorial discretion is broad, it is not unlimited. The judiciary is empowered to infringe on the exercise of prosecutorial discretion when it is necessary to review and interpret the results of the prosecutor's actions when those actions violate certain constitutional mandates."); *State v. Smith*, 276 S.C. 494, 498, 280 S.E.2d 200, 202 (1981) ("It is an equal abuse of discretion to refuse to exercise discretionary authority when it is warranted as it

is to exercise the discretion improperly."); *see also Missouri v. Frye*, 566 U.S. 134, 148 (2012) ("[A] defendant has no right to be offered a plea . . . nor a federal right that the judge accept it.") (citations omitted).

Gadsden asserts he raised two "substantial constitutional issues" at a pre-trial hearing regarding the State's intention to seek LWOP as a sentence at trial, and the circuit court failed "to make factual and legal findings" regarding his arguments. At the pre-trial hearing, the trial court heard arguments from the State and Gadsden regarding the State's notice to seek LWOP as a sentence. Gadsden argued LWOP was the result of vindictive prosecution and amounted to cruel and unusual punishment. The State explained the timeline of its discovery of Gadsden's eligibility for LWOP due to a prior ABWIK conviction. Gadsden and the State both explained the sequence of events that led to trial being postponed for a third time due to Gadsden being hospitalized for mental health issues, which in turn had the effect of giving the State enough time to notice Gadsden (as required by statute) of its intention to seek LWOP as a sentence. Then, the trial court denied Gadsden's motion that the State be prevented from seeking LWOP.

"[U]pon a conviction for a most serious offense as defined by this section, a person must be sentenced to a term of imprisonment for life without the possibility of parole if that person has . . . (1) one or more prior convictions for: (a) a most serious offense; . . . ." S.C. Code Ann. § 17-25-45(A)(1)(a) (2014). Assault and battery with intent to kill is considered a "most serious offense" under the statute. *See* S.C. Code Ann. § 17-25-45(C)(1) (Supp. 2018). "The decision to invoke sentencing under this section is in the discretion of the solicitor." S.C. Code Ann. § 17-25-45(G) (2014). "Where the solicitor is required to seek or determines to seek sentencing of a defendant under this section, written notice must be given by the solicitor to the defendant and defendant's counsel not less than ten days before trial." S.C. Code Ann. § 17-25-45(H) (2014).

As a threshold matter, we must determine whether the trial court's denial of Gadsden's pre-trial motion to strike LWOP amounted to an exercise of the trial court's discretion. *See Smith*, 276 S.C. at 498, 280 S.E.2d at 202 ("It is an equal abuse of discretion to refuse to exercise discretionary authority when it is warranted as it is to exercise the discretion improperly."). We do not believe the record demonstrates the trial court believed it lacked the discretion to consider the motion. Indeed, the trial court: (1) entertained arguments from Gadsden and the State on the issue; (2) referenced Gadsden's mental health issues and acknowledged the State's flexibility in extending the plea offer during its ruling; (3) made a ruling on the record denying Gadsden's motion; and (4) only ever indicated its belief that it lacked

discretion during the sentencing phase, post-conviction, at which point the LWOP statute removed any sentencing discretion.

Because we find the trial court exercised its discretion to hear Gadsden's pre-trial motion, we also review the merits of Gadsden's constitutional arguments that the circuit court denied for an abuse of discretion.  *See State v. Hughes*, 346 S.C. 339, 342, 552 S.E.2d 35, 36 (Ct. App. 2001) ("An abuse of discretion occurs when a trial court's decision is unsupported by the evidence or controlled by an error of law.")

At the pre-trial hearing, the State explained the circumstances that led to its determination to seek LWOP, noting if Gadsden had appeared at the trial as scheduled on April 11, 2016, LWOP would not have been an option because the State could not have noticed Gadsden within the statutorily required period.  The State explained Gadsden's failure to appear at the trial, and the subsequent continuance of the trial date, provided the State sufficient time to notice Gadsden under the statute of the State's intent to seek LWOP as a sentence.  The State also discussed a plea offer it extended Gadsden, which did not include a LWOP requirement, and the State maintained at the pre-trial hearing the plea was still on the table until the trial started.  At the hearing, Gadsden argued he was being punished for "asserting his right to trial," questioned why it took up until two days before the trial was scheduled for the State to discover he was LWOP eligible, and stated it would be cruel and unusual punishment for Gadsden to be subject to LWOP now, since the trial date was re-scheduled due to his hospitalization for mental health issues.[1]

Under the facts of this case, we find the prosecutor was within its discretion to seek LWOP as a possible sentence, and complied with statutory procedures to notify Gadsden of the State's intention to do so.  Prosecutors have "broad" discretion, though "there are undoubtedly constitutional limits upon its exercise." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978); *see United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982) ("A charging decision does not levy an improper 'penalty' unless it results solely from the defendant's exercise of a protected legal right, rather than the prosecutor's normal assessment of the societal interest in prosecution."); *see also State v. Fletcher*, 322 S.C. 256, 260, 471 S.E.2d 702, 704

---

[1] Gadsden has schizophrenia. Two weeks before trial, Dr. Donna Schwartz-Maddox found him incompetent to stand trial.  However, the day of trial, Dr. Schwartz-Maddox testified Gadsden was now competent—based on her evaluations of him on the eve of trial—because of the effectiveness of his medications, and the trial court agreed.

(Ct. App. 1996) ("In a criminal prosecution, however, punishment of the offender is recognized as a proper motivation for a sentencing trial judge or a prosecutor."); *id.* ("[T]he presence of a punitive motivation, therefore, does not provide an adequate basis for distinguishing governmental action that is fully justified as a legitimate response to perceived criminal conduct from governmental action that is an impermissible response to noncriminal, protected activity." (quoting *Goodwin*, 457 U.S. at 373)). Accordingly, Gadsden did not carry his "heavy burden of proving" that the imposition of LWOP "could not be justified as a proper exercise of prosecutorial discretion." *State v. Odom*, 412 S.C. 253, 264, 772 S.E.2d 149, 154 (2015) (quoting *United States v. Wilson*, 262 F.3d 305, 316 (4th Cir. 2001)). Aside from implying that the timeline of the State's notice of LWOP was suspect, Gadsden provided no evidence at the pre-trial hearing that the State was motivated by actual vindictiveness—that "(1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus"—nor that the "circumstances surrounding the initiation of the prosecution pose[d] a realistic likelihood of vindictiveness" to raise a "presumption of vindictiveness" under the law. *Id.* at 263–64, 772 S.E.2d at 154 (quoting *Wilson*, 262 F.3d at 314–17).

Finally, as to Gadsden's argument that his mental illness precluded the State from seeking LWOP, we hold this is unsupported by law. *See* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."); *Curtis v. State*, 345 S.C. 557, 575, 549 S.E.2d 591, 600 (2001) ("The Eighth Amendment only prohibits sentences which are grossly out of proportion to the severity of the crime."). Gadsden cites generally to *Miller v. Alabama*, 567 U.S. 460 (2012) and *Aiken v. Byars*, 410 S.C. 534, 765 S.E.2d 572 (2014), to support his argument that the factual circumstances of his case "may prevent the use of mandatory LWOP" due to his mental illness. Both *Miller* and *Byars* relate to LWOP sentences for juvenile offenders. In *Miller*, the United States Supreme Court held mandatory LWOP sentences for juvenile offenders violated the Eighth Amendment's prohibition on cruel and unusual punishments. 567 U.S. at 465. In *Byars*, the South Carolina Supreme Court concluded *Miller* applied retroactively, and it found *Miller*'s holding applied to permissible as well as mandatory life sentencing schemes for juvenile offenders. 410 S.C. at 541–44, 544, 765 S.E.2d at 576–77. The court determined:

> *Miller* establishes a specific framework, articulating that the factors a sentencing court consider at a hearing must include: (1) the chronological age of the offender and the hallmark features of youth, including 'immaturity,

impetuosity, and failure to appreciate the risks and consequence'; (2) the 'family and home environment' that surrounded the offender; (3) the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and how familial and peer pressures may have affected him; (4) the 'incompetencies associated with youth—for example, [the offender's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the offender's] incapacity to assist his own attorneys'; and (5) the 'possibility of rehabilitation.'

*Id.* at 544, 765 S.E.2d at 577 (quoting *Miller*, 567 U.S. at 477–78). The *Byars* court went on to explain, "*Miller* requires that before a [LWOP] sentence is imposed upon a juvenile offender, he must receive an individualized hearing where the mitigating hallmark features of youth are fully explored." *Id.* at 545, 765 S.E.2d at 578.

Gadsden was in his twenties at the time of trial. Although he attempts to analogize mental illness with being a juvenile, thus warranting "individualized sentencing" instead of mandatory LWOP, we believe current law does not support a finding that Gadsden's Eighth Amendment rights were violated by the LWOP sentence in this case. The State determined Gadsden was eligible for LWOP on April 9, 2016, but it did not decide to submit the paperwork to the LWOP committee until the trial was continued. *See* § 17-25-45(G) ("The decision to invoke sentencing under this section is in the discretion of the solicitor."). Gadsden was given notice of the State's intention to seek LWOP as a sentence on May 2, 2016, after the trial was rescheduled for June 6, 2019. *See* § 17-25-45(H) ("Where the solicitor is required to seek or determines to seek sentencing of a defendant under this section, written notice must be given by the solicitor to the defendant and defendant's counsel not less than ten days before trial."). Gadsden was previously convicted for assault and battery with intent to kill. Assault and battery with intent to kill is considered a "most serious offense" under the statute. *See* § 17-25-45(C)(1). Gadsden was convicted at trial in this case for armed robbery and two counts of kidnapping. *See* § 17-25-45(A)(1)(a) ("[U]pon a conviction for a most serious offense as defined by this section, a person *must* be sentenced to a term of imprisonment for life without the possibility of parole if that person has . . . (1) one or more prior convictions for: (a) a most serious offense; . . . .") (emphasis added). There is no doubt a wide disparity between Gadsden's life sentence and the twelve-year sentence White received. The trial court was concerned about the disparity, but was powerless under current law to impose a lesser sentence on Gadsden. So are we.

Accordingly, Gadsden's convictions and sentence are

**AFFIRMED.**

**WILLIAMS, GEATHERS, and HILL, JJ., concur.**